## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| STATE OF WISCONSIN,<br><br>     Plaintiff,<br><br>  v.<br><br>3M COMPANY (a/k/a Minnesota Mining and Manufacturing Company); E. I. DU PONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; DUPONT DE NEMOURS, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; KIDDE-FENWAL, INC.; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS, LP; CHEMGUARD, INC.; AMEREX CORPORATION; CHEMDESIGN PRODUCTS, INC.; BASF CORPORATION; DYNAX CORPORATION; ARCHROMA U.S., INC.; CARRIER GLOBAL CORPORATION; UTC FIRE & SECURITY AMERICAS CORPORATION, INC.; CLARIANT CORPORATION; AND DOE DEFENDANTS 1-20,<br><br>     Defendants. | No. 3:22-cv-00412-wmc |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF STATE OF WISCONSIN TO REMAND TO STATE COURT

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................. 1

II. BACKGROUND .................................................................................................... 2

    A.  Factual Background ................................................................................... 2

    B.  Procedural Background .............................................................................. 4

III. LEGAL STANDARDS ......................................................................................... 6

IV. ARGUMENT ........................................................................................................ 6

    A.  The Pending CTO Should Play No Role in This Court's Decision-Making ................ 7

    B.  Federal-Officer Removal Does Not Apply. .............................................. 10

        1.  Tyco fails to show that it "acted under" federal officers. ................. 11

        2.  Tyco fails to show a connection between its purported federal-officer conduct and the State's suit .................................................................. 16

        3.  Tyco do not demonstrate a colorable federal defense ........................ 18

    C.  Federal Enclave Removal Does Not Apply. ............................................ 21

V.  CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*,
  2012 WL 12897212 (N.D. Ala. Dec. 6, 2012) .................................................. 22, 23

*Anderson v. Crown Cork & Seal*,
  93 F. Supp. 2d 697 (E.D. Va. 2000) ........................................................................ 24

*Baez-Sanchez v. Sessions*,
  862 F.3d 638 (7th Cir. 2017) ..................................................................................... 9

*Bailey v. Monsanto Co.*,
  176 F. Supp. 3d 853 (E.D. Mo. 2016) ..................................................................... 17

*Baker v. Atl. Richfield Co.*,
  962 F.3d 937 (7th Cir. 2020) .............................................................. 12, 13, 16, 17

*Bd. of Cnty. Cmm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*,
  25 F.4th 1238 (10th Cir. 2022) ............................................................................... 23

*Betzner v. Boeing Co.*,
  910 F.3d 1010 (7th Cir. 2018) ....................................................................... passim

*Blahnik v. BASF Corp.*,
  No. C.A. C-06-410, 2006 WL 2850113 (S.D. Tex. Oct. 3, 2006) ..................... 24, 25

*Boyle v. United Technologies Corp.*
  487 U.S. 500 (1988) ..................................................................... 18, 20, 21

*Camargo v. Gino Morena Enterprises, L.L.C.*,
  No. EP-10-CV-242-KC, 2010 WL 3516186 (W.D. Tex. Sept. 2, 2010) ................. 25

*City & Cnty. of Honolulu v. Sunoco LP*,
  39 F.4th 1101 (9th Cir. 2022) .............................................................. 13, 22, 23

*Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*,
  463 U.S. 1 (1983) ....................................................................................... 6, 8

*Fu's Garden Restaurant v. Archer-Daniels-Midland Co.*, No. C,
  00-0579 MJJ, 2000 WL 635440 n.1 (N.D. Cal. May 9, 2000) ................................. 8

*Graves v. 3M Co.*,
  17 F.4th 764 (8th Cir. 2021) ................................................................................... 10

*Hercules, Inc. v. United States*,
  516 U.S. 417 (1996) ................................................................................ 18, 21

*In re C.R. Bard, Inc.*,
  MDL No. 2187, 2015 WL 1641343 n.1 (J.P.M.L. Apr. 7, 2015) ................................................ 9

*Kelly v. Monsanto*,
  No. 4:15 CV 1825 JMB, 2016 WL 3543050 (E.D. Mo. June 29, 2016) ................................. 17

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ................................................................................ 6

*Landis v. North American Co.*,
  299 U.S. 248 (1936) ................................................................................ 7

*LG Display Co. v. Madigan*,
  665 F.3d 768 (7th Cir. 2011) ................................................................. 6, 8

*Lu Junhong v. Boeing Co.*,
  792 F.3d 805 (7th Cir. 2015) ................................................................ 12, 14

*Martin v. Peterson Health Operations, LLC*,
  37 F.4th 1210 (7th Cir. 2022) ................................................................ 12

*Mater v. Holley*,
  200 F.2d 123 (5th Cir. 1952) ................................................................. 22

*Mayor & City Council of Baltimore v. BP p.l.c.*,
  31 F.4th 178 (4th Cir. 2022) ............................................................... 17, 23

*Mesa v. California*,
  489 U.S. 121 (1989) ................................................................................ 6

*Moore v. Olson*,
  368 F.3d 757 (7th Cir. 2004) ................................................................. 9

*Nessel v. Chemguard, Inc.*,
  No. 1:20-cv-1080, 2021 WL 744683 (W.D. Mich. Jan. 6, 2021) ...................................... 15, 16

*Paul v. United States*,
  371 U.S. 245 (1963) ............................................................................... 22

*Rhode Island v. Shell Oil Prod. Co.*,
  35 F.4th 44 (1st Cir. 2022) ...................................................................... 23

*Ruppel v. CBS Corp.*,
  701 F.3d 1176 (7th Cir. 2012) ......................................................... 10, 18, 21

iii

*Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10,*
   966 F.3d 661 (7th Cir. 2020) ........................................................................... 17

*Steel Co. v. Citizens for a Better Env't,*
   523 U.S. 83 (1998) ............................................................................................ 9

*Ayo v. 3M Co.,*
   No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) ......... 15

*Va. Off. for Protection & Advocacy v. Stewart,*
   563 U.S. 247 (2011) .......................................................................................... 8

*Watson v. Phillip Morris Cos.,*
   551 U.S. 142 (2007) ................................................................................... passim

*Wilde v. Huntington Ingalls, Inc.,*
   616 F. App'x 710 (5th Cir. 2015) ..................................................................... 16

**Statutes**

28 U.S.C. § 1331 .................................................................................................... 22

28 U.S.C. § 1407(a) ................................................................................................ 5

28 U.S.C. § 1442(a)(1) ....................................................................................... 7, 10

42 U.S.C. § 1442(a)(1) ............................................................................................ 1

U.S. Const. art. I, § 8, cl. 17 .................................................................................. 22

**Rules**

Fed. R. Civ. P. 8(a) ................................................................................................ 6

**Regulations**

49 C.F.R. §§ 571.101–500 ..................................................................................... 14

**Other Authorities**

*Multidistrict Litigation Manual* § 3:1 (May 2022 update) ........................................ 8

## I.  Introduction

The State of Wisconsin brings exclusively state-law tort claims against eighteen companies that contaminated the State's environment with per- and poly-fluoroalkyl substances ("PFAS"), a class of pernicious pollutants known colloquially as "forever" chemicals. *See* Compl., ECF No. 1-1 ¶¶ 1–11, 16–39. PFAS have pervasively contaminated "groundwater, air, sediment, surface water, and drinking water throughout Wisconsin," *id.* ¶ 10, injuring "public health, natural resources, property, and economic well-being," *id.* ¶ 8. Indeed, "[n]o corner of the State has been left untouched." *Id.* ¶ 10. Accordingly, Wisconsin seeks to hold liable companies responsible for the wide array of PFAS, PFAS-containing products, and products that degrade into PFAS (collectively, "PFAS Products") that were emitted into Wisconsin's environment from myriad sources. *See* ¶¶ 52–60 (describing types of PFAS and their applications).

Although the State's Complaint presents no federal issues on its face, Tyco Fire Products LP and Chemguard, Inc. (collectively, "Tyco"[1]) removed this action. Tyco is a major manufacturer, marketer, promoter, and seller of aqueous film-forming foam ("AFFF"), PFAS-containing firefighting agents that contributed to Wisconsin's injuries. *See id.* ¶¶ 30–31. Despite removing this action, attempting to invoke this Court's jurisdiction, and improperly dragging an unwilling state sovereign into federal court, Tyco argues that this Court should avoid resolving this Motion. *See* ECF No. 10 (Tyco's motion to stay this action). To the contrary, foundational federalism, comity, and jurisdictional principles counsel for swiftly resolving this Motion.

Doing so is especially important because this Court lacks subject-matter jurisdiction under either of Tyco's theories. <u>First</u>, Tyco invokes the federal-officer removal statute, 42 U.S.C. § 1442(a)(1), positing that when it designed, made, and sold the AFFF that caused Wisconsin's injuries, it was a government contractor "acting under" federal officers. *See* Notice of Removal ("NOR"), ECF No. 1 ¶¶ 23–36. Tyco's federal-officer removal theory is riddled with defects. Tyco

---

[1] In referring to Tyco Fire Products LP and Chemguard, Inc. as "Tyco," Wisconsin follows the convention used by Tyco in its Notice of Removal. *See* ECF No. 1 at 1. Wisconsin does not waive any potential arguments relating to whether the two entities are separate corporations.

implausibly suggests that *any* of its AFFF sales (including to customers other than the federal government) provide a basis for federal-officer removal because Tyco had to comply with detailed federal specifications for AFFF. *Id.* ¶¶ 24–36. Even accepting Tyco's version of the facts, Tyco's removal theory is inconsistent with a chorus of U.S. Supreme Court and Seventh Circuit precedents holding that a private party does not become a federal officer merely because it subjected itself to a demanding regulatory scheme. Indeed, Tyco has not alleged that it has ever sold a single drop of AFFF to the federal government, much less alleged that the AFFF it has sold to the federal government has had some bearing on the State's injuries and claims. Accordingly, Tyco fails to establish that it acted under a federal officer, and Tyco cannot demonstrate the required connection between its conduct under a federal officer and the State's injuries and claims. Even more, Tyco flunks its burden to show that it has a "colorable federal defense" to the State's claims, as is required to invoke the federal-officer removal statute.

Second, Tyco argues that because the Complaint refers to PFAS contamination emanating from Fort McCoy, the U.S. Army garrison in Monroe County, Tyco is entitled to remove because of federal enclave jurisdiction. *Id.* ¶ 37–42. But the State's claims do not "arise" at Fort McCoy or any other federal enclaves for two reasons. First, the State seeks relief only for harms sustained within Wisconsin's sovereign territory, which necessarily excludes harms suffered at Fort McCoy. Second, federal enclave jurisdiction does not attach where, as here, the alleged injury did not occur within a federal enclave, and the overwhelming majority of the conduct and occurrences giving rise to liability took place outside the enclave.

Because Tyco fails to show there is federal subject-matter jurisdiction, this state-law action belongs in state court. This Court should grant the Motion.

## II.     Background

### A.     Factual Background

PFAS are a group of synthetic chemicals that do not occur naturally in the environment. Compl. ¶¶ 2, 51–54. Several features of PFAS make them highly problematic pollutants. They are toxic and carcinogenic to humans at extremely low levels. *Id.* ¶¶ 4, 63. They are highly resistant

to degradation—so much so that they are colloquially known as "forever" chemicals. *Id.* ¶¶ 3, 6, 60, 64. And they are mobile once released into the environment, so they tend to contaminate surface water and groundwater. *Id.* ¶¶ 6, 60.

PFAS have been used in many consumer and industrial applications since the 1940s. *Id.* ¶¶ 2, 5, 55. These include non-stick cookware, food packaging, stain-resistant textiles, water-resistant textiles, personal care products, and aqueous film-forming foam ("AFFF"), a type of firefighting agent. *Id.* ¶¶ 5, 55. Because of their widespread use, PFAS have been released into the State's environment at a multitude of sites and through a wide range of pathways. *Id.* ¶¶ 56–59. And because of their mobility, PFAS spread easily once released. *Id.* ¶¶ 6, 60. PFAS have affected "groundwater, air sediment, surface water, and drinking water throughout Wisconsin," and "[n]o corner of the State has been left untouched." *Id.* ¶ 10. For example, Wisconsin has identified numerous heavily contaminated sites ranging from the Eau Claire Water Treatment Facility to an aluminum cookware factory in Manitowoc. *Id.* ¶ 144. Numerous state waters including Lake Superior are considered "impaired" by PFAS under Section 303(d) of the federal Clean Water Act. *Id.* ¶ 157. PFAS pollution has required the State to issue fish consumption advisories for numerous water bodies and fish species. *Id.* ¶ 165. Groundwater in Adams, the Town of Campbell, the Town of Crescent, Eau Claire, La Crosse, Madison, Marinette, Marshfield, Mosinee, the Town of Peshtigo, Rhinelander, Rib Mountain, Rothschild, Wausau, West Bend, and Weston has been contaminated. *Id.* ¶ 151. To reiterate: "No corner of the State has been left untouched." *Id.* ¶ 10.

The State faces a significant public health and environmental problem because of PFAS, *id.* ¶¶ 10–14, 135–40, and the eighteen defendants ("Defendants") are uniquely responsible. *Id.* ¶¶ 5, 16–39. Defendants are major corporations that designed, manufactured, marketed, promoted, sold, supplied, distributed, used, and/or disposed of PFAS Products. *Id.* ¶¶ 5. They knew many decades ago about the PFAS Products' environmental and public health risks. *Id.* ¶¶ 83–134. As sophisticated and well-resourced companies, Defendants had superior knowledge about PFAS risks compared to "any person or government entity" including the State. *Id.* ¶¶ 137–39. But Defendants failed to warn customers, users, the public, and the State about those risks, and also

failed to take other precautionary measures to mitigate PFAS environmental pollution. *Id.* ¶ 135. In fact, Defendants misleadingly promoted PFAS Products as safe and appropriate for widespread use. *Id.*

### B.    Procedural Background

The State sued the eighteen Defendants in state court. *See generally* Compl. The State believes "Defendants should bear the necessary clean-up costs because it is Defendants who profited immensely from selling PFAS Products while simultaneously concealing and misrepresenting the dangerous effects of those products on public health and the environment." *Id.* ¶ 179. The State brings exclusively state-law tort claims for public and private nuisance, trespass, negligence, strict liability failure to warn, and strict liability design defect. *Id.* ¶¶ 180–244.

Tyco timely removed this action. *See* ECF No. 1. None of the sixteen other Defendants have since endorsed Tyco's theories of federal subject-matter jurisdiction. Tyco is a major manufacturer, marketer, promoter, and seller of AFFF that contained and contains PFAS, including in Wisconsin. *Id.* ¶¶ 30–31, 75–76. Tyco advances two removal theories, both unmeritorious. <u>First</u>, Tyco asserts this Court has subject-matter jurisdiction because Tyco "acted under" federal officers. Tyco contends that AFFF are subject to certain U.S. military specifications that require AFFF to contain PFAS. *See* NOR ¶¶ 18–19. Tyco argues that because of these specifications, it was "acting under" federal officers whenever it sold AFFF—even when it was selling AFFF to customers other than the United States. *See id.* ¶¶ 22–36. <u>Second</u>, Tyco contends that because the State's Complaint describes PFAS contamination at Fort McCoy, a U.S. Army garrison, this action is removable as having arisen in a federal enclave. *Id.* ¶¶ 37–42. As explained below, Tyco fails to demonstrate federal jurisdiction under either theory.

Shortly after Tyco removed this action, it notified the Clerk of the Judicial Panel on Multidistrict Litigation (the "Panel," or "JPML") that the State's suit might be a candidate for transfer to the *In re Aqueous Film-Forming Foams Products Liability Litigation* multidistrict

litigation ("*AFFF MDL*").[2] *See AFFF MDL*, Notice of Potential Tag-Along (JPML ECF No. 1502);[3] JPML r.7.1(a) (requirement to notify the Panel's Clerk about "potential tag-along actions"). The *AFFF MDL* consists of thousands of actions relating to PFAS contamination arising out of the use of AFFF. The Panel's Clerk then entered a conditional transfer order ("CTO") that, if finalized, would transfer this action to the *AFFF MDL. See AFFF MDL*, Notice of Filing of CTO and Publication of Briefing Schedule (CTO-99) (JPML ECF No. 1513); *see also* JPML r.7.1(b) (Clerk's authority to enter a CTO).

On August 24, 2022, the State timely filed a motion with the Panel to vacate the CTO. *See AFFF MDL*, State's Motion to Vacate (JPML ECF No. 1550); *see also* JPML r.7.1(f) (party's right to move to vacate a CTO). In that motion, the State asked for two alternative forms of relief: (1) to vacate the CTO because transfer would disserve certain factors enumerated in 28 U.S.C. § 1407(a), the statute describing the purposes of multidistrict litigation; and (2) to stay the effective date of the CTO until after this Court rules on the State' remand motion. *See generally AFFF MDL*, State's Motion to Vacate (JPML ECF No. 1550). Briefing on the State's motion to vacate the CTO is scheduled to complete on September 22, 2022. *See AFFF MDL*, Notice of Filed Oppositions to CTO-99 and Publication of Briefing Schedule (JPML ECF No. 1533). As Tyco acknowledges, the Panel will not rule on the State's motion to vacate the CTO until after it hears the matter on December 1, 2022. *See* ECF No. 10 at 6 n.4. Until the JPML rules on the State's motion to vacate

---

[2] *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, MDL No. 2873 (D.S.C.).

[3] The *AFFF MDL* has two dockets, both accessible via CM/ECF. One docket consists of proceedings before the JPML, which mostly concern whether actions should be transferred to the MDL. The case number for the JPML docket is "No. 2873." The other docket consists of post-transfer proceedings before the District of South Carolina, the transferee court. The case number for the District of South Carolina docket is "No. 2:18-mn-02873-RMG."

When citing entries on the JPML docket, this Memorandum will use the convention, "*AFFF MDL*, [document title] (JPML ECF No. [number])." When citing entries on the District of South Carolina's docket, this Memorandum will use the convention "*AFFF MDL*, [document title] (D.S.C. ECF No. [number])."

the CTO, this action will remain before this Court, and this Court will be the only one empowered to rule on this Motion.

## III.   Legal Standards

Federal courts have limited subject-matter jurisdiction. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.* (citation omitted). Here, this Court must exercise special "restraint" in exercising jurisdiction given "the sovereignty concerns that arise when a case brought by a state in its own courts is removed to federal court," *LG Display Co. v. Madigan*, 665 F.3d 768, 774 (7th Cir. 2011). "[C]onsiderations of comity make [courts] reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. v. Constr. Laborers Vacation Tr.*, 463 U.S. 1, 21 n.22 (1983).

Where, as here, a defendant's theory of federal jurisdiction depends on additional facts they allege in their notice of removal, their allegations are governed by "the federal pleading standards" in Fed. R. Civ. P. 8(a), which require a "short and plain statement" of the grounds for federal jurisdiction. *E.g.*, *Betzner v. Boeing Co.*, 910 F.3d 1010, 1014–15 (7th Cir. 2018) (applying this standard in the federal-officer removal context). This Court is limited to the facts located in the state-court record and Tyco's notice of removal. *Cf. Mesa v. California*, 489 U.S. 121, 136 (1989) (in the federal-officer removal context, noting that "it is the raising of a federal question in the officer's removal petition that constitutes the federal law under which the action against the federal officer arises for Art. III purposes").

## IV.   Argument

This Court should remand this action because Tyco falls far short of its burden to establish that a "clear rule demands" exercising federal subject-matter jurisdiction. *Franchise Tax Bd.*, 463 U.S. at 21 n.22. To avoid jurisdictional scrutiny, Tyco seeks a stay that would delay resolution of this Motion in light of the pending CTO. *See* ECF No. 10 (memorandum of law in support of

Tyco's motion to stay). But foundational federalism, comity, and jurisdictional principles counsel for swiftly resolving this Motion and returning this action to state court.

The need for swift resolution is underscored by the glaring deficiencies in Tyco's two theories of federal subject-matter jurisdiction. Tyco fails to meet three of the four required elements of federal-officer removal. *See* 28 U.S.C. § 1442(a)(1) (federal-officer removal statute). Namely, Tyco does not demonstrate that it ever "acted under" any federal officers, because Tyco ignores a mountain of controlling precedents holding that mere compliance with intensive regulatory schemes does not mean a private party was acting under a federal officer. And because Tyco never acted under a federal officer, it cannot show the required connection between its actions under federal officers and the State's suit. Tyco also fails to set meet the "colorable federal defense" requirement of federal-officer removal, because Tyco fails to allege that it discharged its duty to warn the United States about AFFF risks.

Tyco's federal-enclave theory of removal is equally defective. Put simply, Tyco fails to show—and cannot show—that the State's claims "arise" at Fort McCoy or any federal enclave. The State does not seek relief for injuries experienced inside any federal enclave, because the State would have no proprietary, sovereign, or quasi-sovereign interests to vindicate there. The State instead seeks relief for only injuries in Wisconsin's sovereign territory, and the overwhelming majority of Tyco's conduct and occurrences giving rise to that liability took place outside of federal enclaves. Given the tenuous connection between federal enclaves and the State's claims, federal-enclave jurisdiction is absent.

## A.  The Pending CTO Should Play No Role in This Court's Decision-Making.

Having pulled an unwilling sovereign into federal court with defective removal theories, Tyco has moved this Court to stay this action pending resolution of the CTO. *See* ECF No. 10. In accordance with this Court's order setting a briefing schedule on Tyco's stay motion, the State will soon file an opposition to thoroughly address why a stay is inappropriate under the factors that emanate from *Landis v. North American Co.*, 299 U.S. 248 (1936). Nevertheless, here, the State will briefly explain why deferring resolution of this Motion would pay insufficient regard to

Wisconsin's sovereignty and lie in tension with this Court's inescapable duty to ensure it has jurisdiction over the cases before it.

This Motion is atypical because unusually strong "sovereignty concerns . . . arise when a case brought by a state in its own courts is removed to federal court." *LG Display Co.*, 665 F.3d at 774. The U.S. Supreme Court has similarly stressed that "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd.*, 463 U.S. at 21 n.22. In the analogous context of Eleventh Amendment immunity, where states' sovereignty interests are similarly at stake, the Court has said that it is an "*insult* to a State" for it to be "haled into [federal] court without its consent." *Va. Off. for Protection & Advocacy v. Stewart*, 563 U.S. 247, 258 (2011) (emphasis added).

Such an insult to the State's sovereignty is threatened here. Tyco has not only proffered defective theories of federal jurisdiction, but also invited this Court to enter a stay that would deny the State a timely opportunity to be heard on its remand motion.[4] If this Court does not hear this Motion, the State will be forced to stay in federal court for a lengthy period during which federal jurisdiction will not have even been established. According to Tyco, the Panel will not decide whether to transfer this action to the *AFFF MDL* until December, at earliest. *See* ECF No. 10 at 6 n.4. If this action is transferred, the transferee court is unlikely to rule on this Motion for some time, because it is slated to oversee voluminous motions practice in advance of the *AFFF MDL*'s first bellwether trial in early 2023. *See AFFF MDL*, Case Management Order No. 19 (D.S.C. ECF

---

[4] This Court is the only court with the power to adjudicate this Motion. The presence of the CTO does not deprive this Court of its power to determine its jurisdiction. *See* JPML r.2.1(d) ("The pendency of a . . . conditional transfer order . . . does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court."); *Fu's Garden Restaurant v. Archer-Daniels-Midland Co.*, No. C 00-0579 MJJ, 2000 WL 635440, at *1 n.1 (N.D. Cal. May 9, 2000) (court has power to decide remand motion notwithstanding a CTO). Neither the JPML nor the District of South Carolina (the court where the *AFFF MDL* resides) has any authority to adjudicate the jurisdictional questions presented here. David F. Herr, *Multidistrict Litigation Manual* § 3:1 (May 2022 update) ("The Panel does not have the power to enter any other orders in the actions."); *id.* § 4:30 (transferee court is vested with jurisdiction over an action only after the JPML orders a transfer).

No. 1844). So, if this Court does not hear this Motion, the State may well be forced to wait until mid to late 2023 for a resolution. And the transferee court might need even more time: while that court has ably overseen the *AFFF MDL*, sound case management cannot alter the basic fact that the proceeding contains thousands of actions.

Such an interminable wait would compound the insult to the State's sovereignty. Fortunately, because the Panel's transfer decision will not occur for some time, this Court has the time needed to resolve this Motion. Indeed, the Panel has stressed in many other actions that "[b]etween the date a remand motion is filed and the date that transfer of the action to the MDL is finalized, a court generally has adequate time to rule on a remand motion if it chooses to do so." *E.g.*, *In re C.R. Bard, Inc.*, MDL No. 2187, 2015 WL 1641343, at *1 n.1 (J.P.M.L. Apr. 7, 2015).

To aid this Court's efficient resolution of this Motion, the State has decided not to mount a factual attack against subject-matter jurisdiction for now.[5] Because the defects in Tyco's removal theories are evident on the face of the Complaint and the Notice of Removal, this Court will not have to receive evidence or resolve factual disputes. The simplicity of this Motion further tips the scales in favor of deciding it now.

More fundamentally, Tyco misses the mark to suggest that that remand motions based on a lack of subject-matter jurisdiction are well-suited for delayed resolution. Federal courts have a time-honored obligation to "assure themselves of their own jurisdiction." *Baez-Sanchez v. Sessions*, 862 F.3d 638, 641 (7th Cir. 2017) (quotations omitted). Because jurisdictional requirements "spring[] from the nature and limits of the judicial power of the United States," they are "inflexible and without exception." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). By soliciting a lengthy delay in the resolution of this Motion, Tyco seeks a *de facto* "exception" to these "inflexible" jurisdictional requirements. Such an exception should be avoided.

---

[5] The State has an inalienable right to raise other arguments against federal subject-matter jurisdiction at future, appropriate stages of this litigation. *See Moore v. Olson*, 368 F.3d 757, 759 (7th Cir. 2004) ("Defects in subject-matter jurisdiction, however, may not be waived or forfeited.").

In sum, the pending CTO should play no role in this Court's decision. This Court should not countenance Tyco's attempt to improperly pull an unconsenting state sovereign into federal court, then compound that insult to the State's sovereignty by asking this Court to shut the door to the only forum available for the State to contest subject-matter jurisdiction.

### B.    Federal-Officer Removal Does Not Apply.

Tyco invokes the federal-officer removal statute, 28 U.S.C. § 1442(a)(1). *See* NOR ¶ 3. Under that statute, Tyco bears the burden of showing that it is a "(1) 'person' (2) 'acting under' the United States, its agencies, or its officers (3) that has been sued 'for or relating to any act under color of such office,' and (4) has a colorable federal defense to the plaintiff's claim." *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1180 (7th Cir. 2012). Although the federal-officer removal statute is not read "narrow[ly]," courts nevertheless engage in a diligent inquiry to ensure that all the requirements for federal-officer removal are met. *E.g.*, *id.* at 1180–86 (stating that the federal-officer removal statute is "not narrow or limited," then proceeding to conduct a rigorous jurisdictional analysis).

Tyco flunks the second and third requirements, which are closely related. *Cf. Graves v. 3M Co.*, 17 F.4th 764, 769–70 (8th Cir. 2021) (considering the second and third elements together). Namely, Tyco fails to demonstrate that it has ever "acted under" a federal officer in a manner relevant to the State's claims. Tyco's theory of removal is that because its AFFF was required to comply with federal specifications that required the inclusion of fluorosurfactants (a subset of PFAS), it was "acting under" federal officers at all relevant times. *See* NOR ¶ 26. But under U.S. Supreme Court and Seventh Circuit precedent, "merely being subject to federal regulations . . . is not enough to transform a private entity into a federal officer." *Betzner*, 910 F.3d at 1015. Notably, Tyco did not allege in their Notice of Removal that it has ever sold a single drop of military-specification AFFF ("Mil-Spec AFFF") *to the United States*, much less that its sales of Mil-Spec AFFF to the United States have any connection to Wisconsin's claims or injuries.

Additionally, Tyco and Chemguard fail to meet the fourth requirement to show a colorable federal defense. To prevail on their federal defense, a government contractor that "manufacture[s]

products for the [federal] government" must demonstrate that "(1) the federal government approved reasonably precise specifications, (2) the manufactured equipment conformed to the government's specifications, and (3) the contractor warned the federal government about the equipment's dangers that were unknown to the government." *Id.* at 1016. Tyco has not shown that it "manufacture[d] products for the [federal] government." Tyco also has failed to demonstrate that it warned the federal government about any dangers known to it but unknown to the United States. Tyco's Notice of Removal establishes only that the United States might have known about *some* of the risks of AFFF and other PFAS Products. That is grossly insufficient to plead a colorable government-contractor defense.

### 1.   Tyco fails to show that it "acted under" federal officers.

Tyco's theory of how it "acted under" federal officers is superficially appealing but hollow. Specifically, Tyco does not meet the requirement that "'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Watson v. Phillip Morris Cos.*, 551 U.S. 142, 152 (2007). Tyco was nothing more than "a highly regulated firm" that "cannot find a statutory basis for removal in the fact of federal regulation alone." *Id.* at 153.

Tyco contends that since 1969, the U.S. Navy has maintained specifications for AFFF. *See* NOR ¶ 17. Under Tyco's interpretation of these specifications, Mil-Spec AFFF must contain "fluorocarbon surfactants," and must be listed on a "Qualified Products List" that the Navy oversees and validates. *Id.* ¶¶ 18–19. All "fluorocarbon surfactants" are PFAS, which are the chemical pollutants at issue in the Complaint. *Id.* So, Tyco contends that the United States requires Mil-Spec AFFF to contain PFAS. *Id.* ¶ 18–19.

According to Tyco, the U.S. military has required Mil-Spec AFFF to be used on military bases. *Id.* ¶ 17. Separately, in the civilian aviation context, the Federal Aviation Administration ("FAA") has required Part 139 airports (in simple terms, commercial airports) to use Mil-Spec AFFF. *Id.* ¶ 20. Tyco argues it acted under federal officers because:

> Tyco acted in accordance with detailed specifications, promulgated by Naval Sea
> Systems Command, that govern AFFF formulation, performance, testing, storage,

inspection, packaging, and labeling. Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List . . . .

*Id.* ¶ 26.

Put differently, Tyco believes it acted under a federal officer because it was required to comply with myriad federal regulations to make and sell Mil-Spec AFFF, and because its Mil-Spec AFFF products were subsequently tested by the Navy. Tyco is wrong. As the U.S. Supreme Court held in *Watson*, its leading case on federal-officer removal:

> A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so *even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored*. A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries.

551 U.S. at 153 (emphasis added). Subsequent Seventh Circuit decisions have adhered strictly to this rule. *E.g.*, *Martin v. Peterson Health Operations, LLC*, 37 F.4th 1210, 1212–13 (7th Cir. 2022) (nursing home "subject to extensive federal regulation" before and during the COVID-19 pandemic was not "a public actor"); *Lu Junhong v. Boeing Co.*, 792 F.3d 805, 808 (7th Cir. 2015) (aircraft manufacturer was not acting under a federal officer merely because it self-certified the airworthiness of its designs under detailed FAA-approved procedures).

These decisions make clear that it is immaterial whether Tyco had to comply with federal specifications to make and sell AFFF. Tyco "retain[s] [its] private character even when many aspects of [its] conduct are controlled by federal [requirements]." *Martin*, 37 F.4th at 1213. Rather, for Tyco to have been "acting under" a federal officer, it must have "*assist*[ed], or . . . help[ed] *carry out*, the duties or tasks of [a] federal superior." *Baker v. Atl. Richfield Co.*, 962 F.3d 937, 942 (7th Cir. 2020) (quoting *Watson*, 551 U.S. at 151–52); *see Betzner*, 910 F.3d at 1015 (acting-under occurs only "where the federal government uses a private corporation to achieve an end it

would have otherwise used its own agents to complete" (quotations omitted)).[6] And Tyco has not alleged that it has ever helped carry out a federal superior's tasks.

Notably, Tyco's Notice of Removal does not allege that Tyco has ever sold AFFF to the United States (nor does the State's Complaint).[7] *Cf. Baker*, 962 F.3d at 942 (when a private firm contracts with the federal government wartime to help federal officers "fulfill . . . basic governmental tasks," that firm may be acting under a federal officer (quoting *Watson*, 551 U.S. at 153)). Nor has Tyco alleged that its sales of AFFF to the United States bear any relationship to the State's suit, or that when Tyco failed to warn about the dangers of AFFF, Tyco was acting under a federal officer.[8] Rather, Tyco's only theory of federal-officer removal is that *whenever* it made and sold *any* AFFF—even to customers other than the United States—it was acting under a federal officer. *E.g.*, NOR ¶ 3 ("Tyco is immune from tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product."). That theory is inconsistent with *Watson* and subsequent Seventh Circuit precedent. Indeed, the State has been unable to locate any decisions holding that a manufacturer can become a federal officer by selling products that comply with federal specifications to entities other than the federal government.

---

[6] The law in other circuits confirms this view. *E.g.*, *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1107 (9th Cir. 2022) ("Compliance with the law and obeying federal orders are also not enough, even if the regulation is highly detailed and the private firm's activities are highly supervised and monitored." (quotations omitted)).

[7] In its motion to stay, Tyco suggests that the record in this litigation shows that "[it] is a federal contractor that manufactures a product specifically for the government." ECF No. 10 at 10. No such fact appears in the Complaint or the Notice of Removal.

[8] Tyco alleges that "the military has long depended upon outside contractors like Tyco to develop and supply AFFF," NOR ¶ 25, and that "if Tyco and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself," *id.* And Tyco also alleges that "[a]t least some of the AFFF that has contributed to the alleged contamination has been manufactured by a select group of suppliers (including Tyco) in accordance with the military's rigorous specifications." *Id.* ¶ 3. But these allegations do not show that Tyco supplied any AFFF to *the United States*, that any AFFF Tyco supplied to the United States affected Wisconsin, or that Tyco's failure to warn was directed by the United States.

Tyco's other arguments also fall short. <u>First</u>, Tyco speculates that "[i]f Tyco and other manufacturers did not provide Mil-Spec AFFF, the government would have to manufacture and supply the product itself." NOR ¶ 25. That argument is beside the point because neither the Complaint nor the Notice of Removal alleges that Tyco provided AFFF to the United States, much less that those sales have any relevance to the State's claims or injuries.

<u>Second</u>, Tyco insists that because the Navy's specifications for Mil-Spec AFFF were very detailed, and because the Navy tested Tyco's AFFF products before they were placed on the Qualified Products List, Tyco acted under the direction or control of federal officers. *Id.* ¶ 26. But controlling precedent unambiguously holds that even intensive regulatory oversight cannot transmute private actors like Tyco into federal officers. The Seventh Circuit's decision in *Lu Junhong* is instructive. 792 F.3d at 808–10. There, the FAA subjected Boeing to a multitude of regulatory requirements to demonstrate that its commercial aircraft were airworthy. *Id.* at 808–09. The FAA inspected certain aspects of aircraft design for regulatory compliance, and also allowed Boeing to self-inspect and "self-certif[y]" its regulatory compliance for other aspects of aircraft design. *Id.* at 808–09. Even under those exceptional facts—where the FAA had arguably "conscripted" Boeing's "staff to perform [regulatory] functions"—the Seventh Circuit found Boeing was merely complying with regulations, not acting under federal officers. *Id.* at 809–10.

Decisions like *Lu Junhong* reflect courts' reticence to "expand the scope of the [federal-officer removal] statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries." *See Watson*, 551 U.S. at 153. Consider the automotive industry, where automobile and component manufacturers are required to comply with detailed federal regulations and testing requirements. 49 C.F.R. §§ 571.101–500 (Federal Motor Vehicle Safety Standards); *see, e.g.*, *id.* § 571.116 (prescribing detailed requirements for the boiling point, viscosity, acidity, temperature stability, chemical safety, corrosiveness, fluidity, appearance, fluid color, and other parameters of brake fluid). Or the pharmaceutical industry, where the Food and Drug Administration ("FDA") strictly controls how drugs are tested, approves

new drugs only after a detailed review of data, and monitors the safety of approved drugs.[9] Because intensive federal regulation is commonplace, accepting Tyco's federal-officer removal argument would unduly expand federal jurisdiction.

<u>Third</u>, Tyco relies on *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018), *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683 (W.D. Mich. Jan. 6, 2021), and three orders by the District of South Carolina in the *AFFF MDL* denying motions to remand—which Tyco refers to as "MDL Order 1,"[10] "MDL Order 2,"[11] and "MDL Order 3."[12, 13] Tyco's reliance on these decisions is misplaced.

*Ayo*, MDL Order 1, and MDL Order 2 are distinguishable because there, the complaint or the notice of removal expressly alleged that the defendants invoking federal-officer removal had sold AFFF to the military. In *Ayo*, the plaintiff alleged that the defendants "regularly contract with . . . the DOD, the [U.S. Air Force], specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF to bases throughout the country, including to [a New York Air National Guard base at issue in the complaint]." 2018 WL 4781145, at *9 (quoting the operative complaint). In MDL Order 1, the plaintiff "allege[d] that Tyco manufactured and sold AFFF products . . . to the U.S. military, which used and stored the products at certain sites." MDL Order 1 at 4. In MDL Order 2, the plaintiff represented that the removing defendants had "sold a portion of the AFFF products" at issue in the action "to the U.S. military." MDL Order 2 at 4.

---

[9] *See* U.S. Food & Drug Admin., *Drug Approval Process* (Feb. 26, 2016), https://perma.cc/X4T3-BHPF.

[10] *AFFF MDL*, Order (D.S.C. ECF No. 103).

[11] *AFFF MDL*, Order (D.S.C. ECF No. 320).

[12] *AFFF MDL*, Order (D.S.C. ECF No. 325).

[13] Tyco's motion to stay this action refers to these orders as "*AFFF I*," "*AFFF II*," and "*AFFF III*," respectively. *See* ECF No. 10 at 11.

*Nessel* and MDL Order 3 are inconsistent with U.S. Supreme Court and Seventh Circuit precedent holding that mere compliance with regulations or specifications does not mean that a private party was acting under a federal officer. In *Nessel*, the Western District of Michigan made the same misstep Tyco commits here: the court assumed that just because Tyco made Mil-Spec AFFF, it acted under a federal officer. 2021 WL 744683, at *3. So, too, in MDL Order 3, where the District of South Carolina stated that "[d]esigning AFFF products to military specifications promulgated by the Department of Defense . . . may constitute 'acting under'" a federal officer. MDL Order 3 at 4.

In sum, Tyco does not "adequately state that it was assisting or carrying out the duties of the United States [Government]." *Betzner*, 910 F.3d at 1015. In fact, Tyco has not shown that it has ever sold Mil-Spec AFFF to the United States, or that the United States ordered its failure to warn about product risks. Because Tyco was "simply *complying* with the law," *Watson*, 551 U.S. at 152, Tyco does not meet the acting-under requirement for federal-officer removal.

### 2. Tyco fails to show a connection between its purported federal-officer conduct and the State's suit.

The third element of federal-officer removal requires the removing defendant to show a connection between their actions under federal officers on the one hand, and the plaintiff's claims and injuries on the other. *Baker*, 962 F.3d at 943. Tyco must show that this action is a "suit[] for *or relating to* any act under color of federal office." *Id.* (quotations omitted). Because Tyco does not show that it acted under a federal officer, it cannot show the requisite causal connection between its conduct and the State's suit.

Moreover, even if Tyco demonstrates that *some* of its tortious AFFF-related actions occurred under a federal officer, Tyco has not demonstrated a sufficient connection to the State's suit. While the connection requirement is not unduly demanding, it is nevertheless a necessary element. *See Baker*, 962 F.3d at 943–45 (rejecting the view that the connection requirement is rigid but continuing to confirm that it was met); *see also Wilde v. Huntington Ingalls, Inc.*, 616 F. App'x 710, 713 (5th Cir. 2015) (unpublished) (warning that the connection requirement cannot be

"attenuated to the point of irrelevance"). For example, although the Seventh Circuit has not clearly described the strength of the required connection, it has suggested that to establish the requisite connection, a removing defendant must establish a "significant" connection that is more than "de minimis." *Baker*, 962 F.3d at 945. Similarly, the Fourth Circuit has rejected connections that are "too attenuated" or "too remote." *Mayor & City Council of Baltimore v. BP p.l.c.*, 31 F.4th 178, 232–34 (4th Cir. 2022). And some district courts have held that when the connection between a defendant's actions under a federal officer and the plaintiff's injuries is "*de minimis*," the third element is not satisfied. *E.g.*, *Kelly v. Monsanto*, No. 4:15 CV 1825 JMB, 2016 WL 3543050, at *9 (E.D. Mo. June 29, 2016) (in a pollution case, finding the volumes of a pollutant sold by the defendant to the federal government too insubstantial to support removal); *Bailey v. Monsanto Co.*, 176 F. Supp. 3d 853, 863 (E.D. Mo. 2016) (similar).

Tyco has failed not only to show that it acted under a federal officer, but also to explain how any such conduct has anything more than an attenuated connection to the State's claims. *See* NOR ¶¶ 27–29. Even assuming, for example, that Tyco sold AFFF to the United States, Tyco has not alleged that any of those sales are connected to the State's injuries in Wisconsin.

Tyco's only other argument about the connection requirement—that applying state tort law would conflict with the federal specifications for AFFF—is wholly irrelevant. *Id.* ¶ 28. If Tyco believes Wisconsin law imposes duties of care inconsistent with federal specifications, Tyco may raise an ordinary preemption defense to the State's claims in state court. It is black-letter law that such a defense "do[es] not provide a basis for federal jurisdiction." *Sarauer v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. No. 10*, 966 F.3d 661, 669 n.1 (7th Cir. 2020). Tyco is also permitted to argue in state court that the state-law standard of care should be informed by the federal specifications.

In sum, Tyco has not, and cannot, demonstrate a causal connection between its actions under federal officers and the State's claims and alleged injuries.

### 3.        Tyco do not demonstrate a colorable federal defense.

The final element of federal-officer removal requires Tyco to demonstrate that it has a colorable federal defense. For a defense to be colorable, it must be "plausibl[y]" "valid." *See Ruppel*, 701 F.3d at 1181–82. Tyco asserts only a government-contractor defense, *see* NOR ¶ 30, which applies to entities that "manufacture products for the [federal] government," *Betzner*, 910 F.3d at 1016. The U.S. Supreme Court described the defense in *Boyle v. United Technologies Corp.*:

> Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States.

487 U.S. 500, 512 (1988).

As discussed, Tyco's government-contractor defense fails because it does not allege as a basis for removal that it "manufacture[d]" the AFFF that gives rise to the State's claims "for the [federal] government." *Betzner*, 910 F.3d at 1016. And even assuming Tyco manufactured Mil-Spec AFFF for the federal government, Tyco falls far short of the third *Boyle* requirement: to present a colorable case that it warned the United States about "*any* hazards known to the contractor [i.e., Tyco] but not to the Government." *Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) (citing *Boyle*, 487 U.S. at 512) (emphasis added). This requirement "ensures the manufacturer does not withhold useful safety information" from the United States. *Ruppel*, 701 F.3d at 1183.

Conspicuously absent from Tyco's Notice of Removal is any allegation that Tyco ever warned the United States (or anyone else) about even *some* of the dangers of its PFAS-containing AFFF, much less that Tyco discharged its duty to "warn[] the United States about *any* hazards known to the contractor but not to the Government." *Hercules, Inc.*, 516 U.S. at 422 (citing *Boyle*, 487 U.S. at 512) (emphasis added). Instead, Tyco's Notice of Removal alleges only that the United

States had some knowledge about some PFAS risks at certain times. NOR ¶ 34. Specifically, Tyco's Notice of Removal states:

- "The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand." *Id.*

- "[T]he United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues." *Id.*

- That a 1980 report recognized that the PFAS in AFFF "are considered to have adverse effects environmentally." *Id.* (quotations omitted).

- "In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA," one type of PFAS, "which reviewed in detail" studies "pertaining to alleged associations between PFOA and cancer." *Id.*

- "[I]n a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA," which are two types of PFAS. *Id.*

- The Navy continues to recognize that PFAS will be present in some AFFF. *Id.*[14]

The absence of allegations about Tyco's warnings is no accident. Tyco, a frequent defendant in PFAS-related actions, is familiar with the elements of a government-contractor defense. ECF No. 10 at 13 (Tyco's acknowledgement). Presumably, Tyco is aware of facts preventing it from alleging that it discharged its duty to warn.

If this Court harbors any doubts, the State's Complaint provides a nail in the coffin that underscores why Tyco's government-contractor defense is not colorable. The State alleges that "[a]t all times relevant to this action," "Defendants [including Tyco] had superior knowledge of [the dangers posed by PFAS Products including AFFF] and were in the position to eliminate, reduce, or mitigate PFAS-related hazards." Compl. ¶ 218. Tyco's Notice of Removal fails to controvert this allegation, so this Court must accept as true that Tyco had superior knowledge

---

[14] Tyco's motion to stay this action claims that the Notice of Removal alleges that "the United States at all times has had at least as much knowledge as Tyco about the alleged harms of PFAS." ECF No. 10 at 13 (citing NOR ¶¶ 34–35). But as this Court can see for itself, the Notice of Removal contains no such allegation.

19

about the dangers of its PFAS-containing AFFF at all relevant times. Because Tyco never alleges that it discharged its obligation to inform the United States about these dangers, this Court must conclude that Tyco has failed to show a colorable government-contractor defense.

Similarly, uncontroverted allegations in the Complaint show that Tyco Fire Products, LP knew about the toxicity of PFAS and its environmental risks when the company started to produce PFAS-containing AFFF in or before the *1970s*. Compl. ¶ 75 (Tyco Fire Products, LP's initiation of AFFF manufacturing); *id.* ¶¶ 83–94, 105–09 (state of industry knowledge); *id.* ¶¶ 128–32 (Tyco's awareness of industry knowledge). Meanwhile, Tyco's Notice of Removal alleges only that the United States was aware of some of the environmental risks of PFAS-containing AFFF by *1980*, and of the toxicity of PFAS-containing AFFF by *2001*. NOR ¶ 34 ("[A]s early as October 1980, a report [by the military] stated that AFFF . . . 'constituents . . . are considered to have adverse effects environmentally); *id.* ("By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be 'toxic' and 'persistent.'"). Other uncontroverted allegations in the Complaint are that by *1979*, Tyco Fire Products, LP knew about the potential carcinogenicity of PFAS. Compl. ¶ 92 (state of industry knowledge); *id.* ¶¶ 128–32 (Tyco's awareness of industry knowledge). Meanwhile, Tyco's Notice of Removal only alleges that in *2002*, the United States "issued a draft hazard assessment" that described "alleged associations between [one type of PFAS] and cancer." NOR ¶ 34. Thus, the record, including the facts alleged by Tyco, further underscores that the United States' knowledge—if any and to any degree—of the dangers of Tyco's products has lagged Tyco's knowledge.

Tellingly, Tyco—instead of trying to meet the third element of a government-contractor defense—tries to sidestep it. Tyco suggests that it can avoid its duty to warn the United States if "the government was *sufficiently* informed regarding alleged product-related dangers, to exercise its discretionary authority in specifying and procuring MilSpec AFFF." NOR ¶ 34 (citing *Boyle*, 487 U.S. at 512) (emphasis added). This Court should reject Tyco's attempt to dilute its duty to warn because it clashes with controlling precedent. The U.S. Supreme Court imposed upon government contractors a broad duty to warn to prevent them from "perversely imped[ing] [the

United States] by cutting off information highly relevant to [its officers'] discretionary decision[s]." *Boyle*, 487 U.S. at 513. The Court worried that "in [the] absence" of a broad duty to warn, "the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks." *Id.* at 512–13. The Court subsequently clarified that government contractors must "warn[] the United States about *any* hazards known to the contractor but not to the Government." *Hercules, Inc.*, 516 U.S. at 422. So, the question is not whether the federal government is *sufficiently* informed about product-related dangers. Consonantly, the Seventh Circuit has required a government contractor to show "that the [government] knew of *all* of the hazards associated with [a product] such that there were *no* dangers in the use of the [product] that were known to the supplier but not to the United States." *Ruppel*, 701 F.3d at 1185 (citing *Boyle*, 487 U.S. at 512) (emphasis added).

Tyco falls far short of establishing a colorable federal defense because it has failed to allege that it warned the United States about any hazards known to Tyco but not the United States. Because Tyco has failed to show a colorable federal defense, Tyco does not meet its burden to establish federal-officer removal.

### C. Federal Enclave Removal Does Not Apply.

Tyco contends that because the Complaint refers to PFAS contamination at Fort McCoy—a U.S. Army garrison in Monroe County—the State's claims "arise" on a federal enclave, conferring federal-question jurisdiction. *See* NOR ¶¶ 37–42. But federal enclave jurisdiction is absent because the State's claims do not "arise" at Fort McCoy or on any other enclave lands for two reasons. First and most fundamentally, the State does not seek relief for PFAS-related injuries suffered within Fort McCoy or any other federal enclaves. In fact, the State *cannot* seek redress for such injuries because it lacks any sovereign or proprietary interests on federal enclave land. Second, the large majority of state-wide PFAS-related injuries suffered in Wisconsin's sovereign territory has no connection whatever with Fort McCoy or any other federal enclave, and the small fraction of contamination flowing from PFAS contamination there is insufficient to show that the State's claims "arise" there.

21

The Complaint alleges that Fort McCoy is PFAS-contaminated. *See* Compl. ¶ 144(b). The State does not dispute that Fort McCoy is a federal enclave, since the land was ceded to the United States with express consent from the Wisconsin Legislature. *See* Wis. Stat. § 1.02(2). But the Complaint makes clear that the PFAS contamination emanating from Fort McCoy is not a major focus of the State's complaint, which takes a statewide perspective. "[T]he State has discovered dangerous levels of PFAS in groundwater, air, sediment, surface water, and drinking water throughout Wisconsin," and "[n]o corner of the State has been left untouched." Compl. ¶ 10. And under well-established precedent, the fact that a small portion of "[t]he ubiquitous contamination and injury caused by PFAS Products in Wisconsin" is caused by PFAS initially released at Fort McCoy is insufficient to support federal enclave jurisdiction. *See id.* ¶¶ 9, 144(b).

The U.S. Constitution grants Congress authority "[t]o exercise exclusive Legislation in all Cases whatsoever, . . . over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts" and other federal facilities. U.S. Const. art. I, § 8, cl. 17. The United States thus has exclusive jurisdiction over such so-called federal enclaves, and only federal law applies there to the exclusion of the laws of the state in which the enclave sits. *See, e.g.*, *Paul v. United States*, 371 U.S. 245, 264 (1963). In turn, "courts have reasoned that federal courts must also have subject-matter jurisdiction over controversies that arise on such enclaves," which is "known as federal-enclave jurisdiction and constitutes a subspecies of federal-question jurisdiction pursuant to 28 U.S.C. § 1331." *Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*, No. CV-12-RRA-1874-NE, 2012 WL 12897212, at *7 (N.D. Ala. Dec. 6, 2012) (quotation omitted); *see generally Mater v. Holley*, 200 F.2d 123 (5th Cir. 1952).

The Seventh Circuit has not spoken on the contours of federal enclave jurisdiction, but other courts have explored the question. Courts generally "invoke the doctrine of federal enclave jurisdiction narrowly," and for such jurisdiction to attach, a complaint "must allege [either] that an injury occurred on a federal enclave *or* that an injury stemmed from conduct on a federal enclave." *City & Cnty. of Honolulu v. Sunoco LP*, 39 F.4th 1101, 1111 (9th Cir. 2022) (emphasis added). Where a complaint alleges some facts that occurred within an enclave and other facts that occurred

outside of it, courts diverge slightly on when a claim "arises" on a federal enclave and jurisdiction thus attaches. The First and Tenth Circuits have recently applied a strict standard, holding that the doctrine "generally requires that *all* pertinent events take place on a federal enclave." *Bd. of Cnty. Cmm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1271 (10th Cir. 2022) (quotation omitted); *Rhode Island v. Shell Oil Prod. Co.*, 35 F.4th 44, 58 (1st Cir. 2022) (same). The Fourth Circuit, applying a broader standard, has focused on "whether the injury itself was sustained within the federal enclave." *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 218 (4th Cir. 2022). In tort cases, district courts have generally "look[ed] to the tort itself, and the law of the jurisdiction which created the tort, to determine where the tort arises." *Amtec*, 2012 WL 12897212, at *10. "Whether courts look to the 'locus,' 'nexus,' 'pertinent events,' or 'elements,' the one consistent approach in all of these cases appears to be that they looked to the state law which created the claim to determine where it arose." *Id.*

The State's claims here do not arise at Fort McCoy because the Complaint neither "allege[s] that an injury occurred on a federal enclave," nor that "an injury stemmed from conduct on a federal enclave." *Honolulu v. Sunoco LP*, 39 F.4th at 1111. As to the first half of that formulation, all the alleged injuries and nearly all the relevant conduct occurred within the sovereign boundaries of Wisconsin, not within Fort McCoy or any other federal enclaves. As for the alleged injuries, the Complaint alleges that "[t]he State brings this action in its capacity as sovereign, as trustee of State natural resources, and as property owner of lands and waters contaminated by Defendants' PFAS Products," and "under the State's *parens patriae* authority to protect its quasi-sovereign interests, including its interest in the health, safety, and welfare of its citizens." Compl. ¶ 47. The State has no sovereign, quasi-sovereign, or proprietary interests in Fort McCoy—precisely because it has ceded such authority to the United States—so it axiomatically was not injured there and is not seeking to vindicate rights arising there.

As for the relevant conduct, the Complaint makes clear that the State's suit focuses on Defendants' tortious conduct that caused PFAS pollution across the entirety of Wisconsin, not injuries suffered within the State's sovereign territory caused by Defendants' PFAS-related

conduct on federal enclaves. The State's suit has a statewide focus: Defendants' PFAS products "have contaminated soil, groundwater, surface water, sediments, fish, wildlife, marine resources, other biota, and other natural resources located throughout the State," *id.* ¶ 144,  and have "resulted in the injury or contamination of state-owned property and other resources owned and/or held by the State, such as its public trust resources and the navigable waters throughout Wisconsin," *id.* ¶ 145; *see also id.* ¶¶ 151 (groundwater), 157 (surface water), 165 (fish and other biota). In fact, the Complaint does not allege that *any Defendant's conduct* occurred at Fort McCoy. Instead, Fort McCoy was one among "[n]umerous locations in Wisconsin" where PFAS products were used or released at "fire training areas"; that PFAS "migrated from the sites" through groundwater to off-base (i.e., off-enclave) locations where they have caused injuries. *Id.* ¶¶ 144, 144(b). Likewise, Tyco's Notice of Removal does not allege that it took any actions at Fort McCoy. *See generally* NOR. Therefore, to the extent the State seeks relief for injuries suffered within its sovereign territory, Tyco fails to establish that any of its relevant conduct occurred within a federal enclave.

In cases like this one, where a state-law complaint alleges a range of conduct or incidents, some of which occurred on a federal enclave but most of which did not, courts frequently find that subject-matter jurisdiction is lacking. In *Anderson v. Crown Cork & Seal*, 93 F. Supp. 2d 697, 699 (E.D. Va. 2000), for example, the plaintiff alleged that the decedent had been injured by asbestos exposure that occurred while "work[ing] aboard United States Navy vessels and other vessels both in drydock and in the navigable waters of the United States." The decedent was primarily stationed on a naval vessel, and it was undisputed "the majority of [his] time aboard the [vessel] it was at sea," and was only "occasionally docked" at a shipyard within a federal enclave. *Id.* at 701. The court thus found "that the decedent's exposure occurred on the U.S.S. Laffey, and not as a result of the Laffey's location 'in' the Shipyard," so enclave jurisdiction was lacking. *Id.* Likewise, in *Blahnik v. BASF Corp.*, No. C.A. C-06-410, 2006 WL 2850113, at *1 (S.D. Tex. Oct. 3, 2006), the plaintiff alleged he developed leukemia from exposure to benzene-containing products produced by the defendants during his long career as an automobile mechanic. The defendants removed in part on enclave grounds, because the plaintiff had worked for two years at Fort Hood

24

in Texas and could have been exposed to benzene there. *Id.* at *4. The court found the fact the fact that the plaintiff "may have worked on an military [sic] base at some point in time is insufficient," because "the Defendants must show that Plaintiffs' causes of action can fairly be said to *arise on* a federal enclave." *Id.*; *see also Camargo v. Gino Morena Enterprises, L.L.C.*, No. EP-10-CV-242-KC, 2010 WL 3516186, at *3 (W.D. Tex. Sept. 2, 2010) (no enclave jurisdiction in employment discrimination suit where plaintiff's job site was on military base but record did not establish adverse employment decision occurred on base).

Under any of the analyses described above, the Complaint does not show that the State's claims "arose" at Fort McCoy. To the contrary, the Complaint establishes that nearly all the "pertinent events" occurred on definitively non-federal land. The fact that the State's Complaint refers to Fort McCoy in one paragraph out of 87 pages does not bring the case within the Court's original federal question jurisdiction.

## V.    Conclusion

Tyco's two theories of removal—federal-officer removal and federal enclave jurisdiction—fall short of establishing subject-matter jurisdiction. This Court should remand this state-law action brought by a state sovereign to state court.


Dated: August 26, 2022

> */s/ Stephanie D. Biehl*
> Stephanie D. Biehl
>
> **SHER EDLING LLP**
>
> Stephanie D. Biehl
> 100 Montgomery Street, Suite 1410
> San Francisco, CA 94104
> Tel.: (628) 231-2507
> Email: stephanie@sheredling.com
>
>
> Joshua L. Kaul
> Attorney General of Wisconsin

R. Duane Harlow
Assistant Attorney General
State Bar # 1025622

Bradley J. Motl
Assistant Attorney General
State Bar # 1074743

Sarah C. Geers
Assistant Attorney General
State Bar # 1066948

Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel.: (608) 266-2950
Fax: (608) 294-2907
Email: harlowrd@doj.state.wi.us
         motlbj@doj.state.wi.us
         geerssc@doj.state.wi.us